`IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

PLISKA INVESTMENTS, LLC,  )
                                              )
                    Plaintiff,              )    TC-MD 120224C
                                              )
          v.                                 )
                                              )
LANE COUNTY ASSESSOR,     )
                                              )
                    Defendant.            )    **DECISION**

This matter comes before the court following trial.  Plaintiff appeals the assessment of

real property identified in Defendant's records as Account 1847084 (subject property) for tax

year 2011-12.[1]  Trial was held by telephone on December 17, 2012.

David Carmichael, Attorney at Law, represented Plaintiff.  Appearing at trial and

testifying for Plaintiff was Jim Pliska (Pliska), Member of the Plaintiff corporation and an

appraiser, who either individually or through his ownership interest in various corporate entities

"owns" numerous investment properties, including approximately 24 gas stations, a golf course

immediately adjacent to the subject property, and a hotel down the street.  Also testifying for

Plaintiff were Clint C. Becraft (Becraft), an appraiser licensed by the state in 1996, and certified

by the state in 2006, whose experience includes approximately five years working as an

appraiser for the Lane County Assessor, leaving that position in 2005 to go to work for Duncan

& Brown Real Estate Analysts (Duncan & Brown), with whom he was employed as a general

appraiser at the time of trial.  Plaintiff's other trial witness was Richard J. Duncan (Duncan),

MAI, SRA, Duncan & Brown.

---

[1] Plaintiff originally appealed three accounts, the main account, which includes land and improvements (structures, etc.), and which is referred to throughout this decision as the subject property, plus two other unimproved (i.e., land only) commercial accounts identified in the assessor's records as accounts 1810363 and 1810348.  By letter dated December 6, 2012, Plaintiff withdrew the two land only accounts, leaving only the value of the Resort property at issue.

Defendant was represented by Roxanne R. Gillespie, MAI, Appraisal Supervisor, Lane County Assessment and Taxation (Lane County A & T), and Pattie Anne Paris (Paris), Registered Appraiser III, (Lane County A & T). Paris presented Defendant's case at trial.

Plaintiff's Exhibit 1 and Rebuttal Exhibits 1-4 and Defendant's Exhibit A and Rebuttal Exhibits A and B, were accepted and admitted into evidence at trial.[2]

## I. STATEMENT OF FACTS

A. *Property description*

The subject property is known as Emerald Valley Resort (Resort). The Resort, built in 1979, is adjacent to a golf course, and is located in Creswell, Oregon, a small rural community about 20 minutes south of Eugene on the I-5 corridor. (*See* Ptf's Ex 1 at 2; Def's Ex A at 9.) According to Becraft's appraisal,

> "[t]he subject [property] was constructed in 1979 as part of a planned golf/destination resort facility that was never completed. * * * The subject improvements were built as a golf club house, restaurant and a health spa complex. The original developer went bankrupt and the bank took ownership of the property. The bank then resold the property to another group of investors, who subsequently separated and sold off the golf course from the resort property."

(Ptf's Ex 1 at 2.)

The Emerald Valley Golf Course, which Pliska owns, is located to the north and east of the subject property. (Ptf's Ex 1 at 39.)

The Resort (the subject property) consists of a 5.73 acre irregularly shaped parcel improved with a two-level, 55,280 square-foot commercial building that has 52,780 square feet

/ / /

---

[2] The court received Defendant's Rebuttal Exhibits A, B, C, and D, with prior approval, by facsimile Friday, December 14, 2012, at 4:21 p.m. However, at trial Parties never referenced Rebuttal Exhibits C or D, nor proffered either exhibit for admission into evidence. Those exhibits are therefore not part of the evidence considered by the court in reaching its Decision herein.

of net rentable area, and 45,250 square-feet excluding hallways and stairways, etc.[3] (Ptf's Ex 1 at 39, 43; Def's Ex A at 2.)  The space within the Resort structure consists of a mixture of office space, a fitness center with fitness equipment, a swimming pool, whirlpool and sauna, and some restaurant space (including a commercial kitchen), plus hallways, an elevator, stairways, restrooms, a lobby and storage space.  (Ptf's Ex 1 at 43; Def's Ex A at 12-15; 31.)

Two unimproved land parcels 3.01 and 2.83 acres in size (the ones appealed and then withdrawn from this case), identified as Accounts 1810363 and 1810348, respectively, are situated to the west of the Resort.  (*See* Ptf's Ex 1 at 39; Def's Ex A at 2-3, 9-10.)  Dale Kuni Road, which cuts between the Resort and the adjacent undeveloped parcels, provides direct access to the Resort.  (Ptf's Ex 1 at 39; *see also* Def's Ex A at 11, 17.)

The upper level of the Resort has 21,780 square feet of floor space, and includes four individual offices, collectively totally 12,880 square-feet of office space, and an 8,900 square-foot restaurant.  (*See* Ptf's Ex 1 at 43.)  A fitness center and additional office space make up the approximately 23,460 square-feet of the Resort's lower level; the bulk of this space – 20,860 square-feet– is devoted to the fitness center, with the remaining 2,600 square-feet allocated between three individual offices.  (*See id*.)  The Resort features wood-framed construction with portions of the lower level made of concrete walls.  (Ptf's Ex 1 at 43; Def's Ex A at 9.)  While Defendant believes the Resort is "of good quality," Plaintiff states the Resort is "of average to good quality construction and [is] in overall average condition relative to [its] age."  (Def's Ex at 9; Ptf's Ex 1 at 44.)  Improvements to the site surrounding the Resort include walkways, patios, retaining walls, asphalt parking lot, south lawn, and landscaped areas near the building and parking lot.  (Ptf's Ex 1 at 44.)

---

[3] The remaining area in the Resort is devoted to common areas, restrooms and additional warehouse area. Defendant includes this additional floor space in its evaluation, while Plaintiff excludes it as non-rentable.

The subject property is zoned General Commercial with Resort Commercial Overlays. (Ptf's Ex 1 at 29-30; Def's Ex A at 9.) Resort Commercial Overlays distinguish "those areas identified by the Creswell Comprehensive Plan as suitable for accommodating large-scale concentrations for recreationally oriented uses. * * * Traditional [] commercial uses shall not be permitted within this subzone except when shown as necessary to support the primary recreationally oriented uses." (Ptf's Ex 1 at 30.) Because of the rural location of the subject property, Plaintiff contends "[c]ommercial expansion [in Creswell] is expected to be limited, as the majority of larger retail facilities are located in Eugene/Springfield * * *." (Ptf's Ex 1 at 19.)

B.    *Sale of subject property*

Plaintiff acquired the subject property in March 2011 for a purchase price of $1,052,187. (Ptf's Ex 1 at 85-86; Def's Ex A at 19.) Ownership of the property was transferred to Plaintiff via statutory warranty deed, which includes the two adjacent unimproved parcels of vacant land to the west of the subject. (Ptf's Ex 1 at 2, 85-86.) The deed allocates $952,187.50 to the subject property and $100,000 to the two adjoining three acre parcels (which are not part of this appeal). (*Id*. at 85-86.) The purchase was apparently part of a bulk purchase that included the Resort, the two adjoining three acre undeveloped commercial parcels, and 14 residential lots either zoned or designed (or both) to be developed with condominiums, for $1,385,000. (Ptf's Rebuttal Ex B at 1; Pliska Trl Test.)

C.    *Assessment and tax roll values*

For the 2011-12 tax year, the subject property has a real market value (RMV) on the assessment and tax rolls of $2,818,571, with $1,497,595 allocated to the land and $1,320,976 to the improvements. (Ptf's Compl at 4; Def's Ex A at 25.) Plaintiff has requested that the RMV be reduced to $950,000. (Ptf's Opening; Ptf's Ex 1 at 73.) That request, made by counsel for

Plaintiff prior to opening statements, differs slightly from the $952,188 set forth in the Complaint, but conforms to the evidence. At trial, Defendant asked the court to reduce the RMV of the subject property from $2,818,571 to $2,780,000 to match the value in its appraisal. (Def's Ex A at 39.)

D.    *The parties' evidence*

1)    *Plaintiff's evidence*

Plaintiff submitted an appraisal report that values the subject property under the sales comparison approach and the income capitalization approach. (Ptf's Ex 1 at 55, 64.) Duncan testified that the cost approach was considered but rejected because it would require very significant depreciation due to the age of the building. That report, prepared by Becraft and Duncan, concludes with a final value estimate of $950,000, the appraiser's giving primary emphasis to the sales comparison approach, and utilizing the income capitalization approach for supportive emphasis. (*Id*. at 73.)

For its sales comparison approach Plaintiff selected seven comparable sales of large buildings with similar physical characteristics that included a mix of athletic facilities and schools (comparables 1 through 5) because such buildings have a mixture of gymnasium, kitchen/cafeteria, and office areas. (*Id*. at 55, 57.) Plaintiff also included the sales of two rural multitenant retail centers because they were deemed "to demonstrate the motivations of investors in large multi-tenant commercial properties in rural areas." (*Id*. at 55.) All of the comparable sales occurred between July 2006 and December 2011, and were built between 1929 and 2006 (with the school built in 1929 (comparable #5) and updated 1970 and 1996) (*Id*. at 55, 57, 60.) Sale prices ranged from a low of $19.35 per square foot to a high of $85.89 per square foot. (*Id*. at 57.) The size of the buildings ranged from a low of 12,236 square feet to a high of 74,836

square feet. (*Id.*) One of the comparable sales (#1) sold twice: first in July 2006 and again in December 2010 after a significant expansion of the structure. (*Id.*) Thus there are eight actual sales, although there are only seven properties. Of the eight sales, six sold for prices between $19.35 per square foot and $32.10 per square foot. (*Id.*) The other two sold for considerably more: $49.26 (comp. #6) and $85.89 (comp. #1-second sale) per square foot. (*Id.*) The appraisers analyzed the sales both on an overall price per square-foot basis and using a qualitative analysis in which the comparables were compared to the subject to determine if they were inferior, superior, or similar, in order to give the appraisers an estimate of value. (*Id.* at 55.) The appraisers found all of the comparables provided indicators of market value higher than appropriate for the subject. (*Id.* at 57-61.) Plaintiff's appraisers gave primary emphasis to comparable sales 1, 2, and 3, an athletic facility and two school properties. (*Id.* at 62.) Their appraisal includes a six-page narrative discussion/analysis of the seven comparable sales and concludes that the value of the subject property is $18 per square foot which, when multiplied by the square footage of the subject property (52,780), generates an estimated market value of $950,040. (*Id.*)

For its income capitalization approach, Plaintiff's appraisers first estimated market rent for the three distinct type of spaces within the subject property: restaurant, office, and fitness center/gymnasium. (*Id.* at 66-68.) The appraisers considered six leased comparables and estimated market rents of $0.75 per square foot for the restaurant space, $0.80 per square foot for the office space, and $0.27 per square foot for the fitness center space. (*Id.* at 67-68.) That yielded a potential gross income of $311,508. (*Id.* at 68.) The appraisers applied a vacancy and credit loss of 20 percent compared to the subject's actual vacancy rate of 29 percent. (*Id.* at 69-70.) The 20 percent rate translates into $62,302 of potential lost income, yielding an effective

gross income (EGI) of $249,206.  (*Id*. at 70.)  The appraisers then estimated expenses for management, insurance, utilities, maintenance and repairs, and replacement reserves, to be $138,460, or 55.6 percent of EGI (rounded), yielding a net operating income (NOI) of $110,746.  (*Id*. at 71.)  According to the testimony of Pliska and Duncan, the subject property has had a history of vacancy problems and has been expensive to operate.  (*see also* Ptf's Ex 1 at 52, 61.)  For the capitalization rate (cap rate) the appraisers utilized two of the comparable sales from their sales comparison approach (comparables 6 and 7).  (*Id*. at 71-72.)  Those two properties had overall rates of 9.9 percent and 11.1 percent.  (*Id*. at 72.)  The appraisers concluded that the subject property had a higher risk than either of those two properties, and estimated an appropriate cap rate to be 11.5 percent, to which they added the effective tax rate of 0.81 percent (0.0081),[4] for an overall rate of 12.31 percent.  (*Id*.)  Dividing their $110,746 NOI by their 12.31 percent cap rate generated an estimated market value of $899,643, which the appraisers rounded to $900,000.  (*Id*.)  As stated earlier, Duncan and Becraft gave primary emphasis to the sales comparison approach and reconciled their two value estimates with the conclusion that the fee simple market value of the subject property as of January 1, 2011, was $950,000.  (*Id*. at 73.)

       2)     *Defendant's evidence*

       Defendant's appraisal relies on the income capitalization and cost approaches to value.  (Def's Ex A.)  Defendant concluded with a value estimate of $2,780,000 under the income approach and $5,800,000 under the cost approach.  (*Id*. at 38.)  Defendant placed primary reliance on the income approach and estimated value of the subject property to be $2,780,000 as of January 1, 2011.  (*Id*. at 38-39.)

/ / /

---

[4] Multiplying the applicable tax rate by the change property ratio.

For its income capitalization approach, Defendant began by estimating market rent based on an analysis of approximately 29 properties which it divided into three property types similar to those recognized by Plaintiff: restaurant/dining, retail/general, and office/multi-tenant space. (*Id*. at 35-37.) Defendant determined that potential market rent for the subject's restaurant space was $.95 per square foot, that the majority of Plaintiff's retail/office space (13,090 of the total 13,640 square feet) had a potential market rent of $1 per square foot, with the remaining 550 square feet capable of generating $1.25 per square foot, and the 20,000 square feet of gymnasium-type space capable of generating a rent of $0.28 per square foot. (*Id*. at 37.) Multiplying those rents by the corresponding square footages in the subject property generated a potential gross income (PGI) of $369,022. (*Id*.) Defendant allowed a 10 percent deduction for vacancy and collection loss ($36,902), for an effective gross income (EGI) of $332,120. (*Id*.) Defendant then deducted expenses of 22 percent for insurance, maintenance, management, and utilities, which cumulatively amounted to $73,066. (*Id*.) Subtracting expenses from EGI resulted in an estimated net operating income (NOI) for the subject property of $259,054. (*Id*.) Defendant analyzed five sales to estimate an appropriate capitalization rate (cap rate) for the subject property, finding a range of 6.3 percent to 7.81 percent. (*Id*. at 34.) Defendant concluded that the subject property had greater risk than its comparable sales and therefore selected a cap rate of 8.5 percent. (*Id*. at 34, 37.) Defendant added the effective tax rate of 0.081 percent (actual rate times changed property ratio) for a built-up or overall cap rate of 9.31 percent. (*Id*. at 37.) Applying the 9.31 percent cap rate to the $259,054 NOI generated an estimated RMV of $2,782,530. (*Id*.) The appraisal report includes virtually no analytical discussion of the appraiser's assumptions and analysis, and there was very little supporting testimony at trial regarding Defendant's appraisal.

Defendant's cost approach consists essentially of a single page of numbers extrapolated from Marshall and Swift. (*Id*. at 33.) For the building itself, Defendant identifies four distinct elements (base cost, exterior walls, heating and cooling, sprinklers) and reports a dollar per square foot total of $122.06. Defendant then applies a 1.15 percent (15 percent) "cost modifier" for a total building cost new of $8,188,145. (*Id*.) Defendant then adds $219,149 for the cost of the pool, patios, paving, etc., and arrives at a total building cost new of $8,407,294. (*Id*.) Defendant adds three percent for entrepreneurial profit ($252,219), for a total cost new (before depreciation) of $8,659,513. (*Id*.) Defendant deducts 25 percent for physical depreciation, and another 25 percent for functional obsolescence to arrive at a depreciated building and structures value of $4,329,757. (*Id*.) Defendant values the land at $1,497,594. Defendant arrived at that number based on an analysis of the sale of five properties occurring between January 16, 2006 and January 14, 2008. (*Id*. at 32.) Defendant concluded that its comparable sale #5 "is the best indicator of value for the subject propert[y]," because it was the only sale of commercial land in the town of Creswell where the subject property is located. *Id*. Defendant concluded that the subject had a land value of $5 per square foot, plus an additional $1 per square foot for site development costs. (*Id*.) Defendant adds the depreciated building value of $4,329,757 plus the land value of $1,497,594 to arrive at a total RMV estimate for the subject property under the cost approach of $5,827,351. (*Id*. at 33.) Defendant rounds that estimate to $5,800,000. (*Id*.)

Defendant gave more weight to its income capitalization approach and concluded that the RMV of the subject property was $2,780,000. (*Id*. at 38-39.)

/ / /

/ / /

/ / /

II.  ANALYSIS

A.    *Real market value and the burden of proof*

The issue to be decided is the total RMV of the subject property as of the assessment date of January 1, 2011.  Under ORS 305.287 (2011),[5] a party may not limit the scope of an appeal to one component of the property tax account if the opposing party seeks a determination of total RMV.[6]  Here, even though Plaintiff appealed only the subject property's land value, Defendant has placed the whole value of the property before the court by its request for a determination of total RMV.

Except for exemptions and special assessments, real property in Oregon is assessed at the lesser of its RMV or its maximum assessed value.  ORS 308.146(2); ORS 308.232.  RMV is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."  ORS 308.205(1).  RMV is to be determined "in all cases" by "methods and procedures in accordance with rules adopted by the Department of Revenue."  ORS 308.205(2).  The Department of Revenue has mandated the consideration of three approaches to real property valuation: the "sales comparison approach, cost approach, and income approach."  OAR 150-308.205-(A)(2)(a).  Not every approach will be applicable to every property.  *Id.*; *see e.g. Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003).  The valuation approach or approaches to be used is "a question of fact to be determined by the court upon the record." *Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979).

---

[5] Unless otherwise noted, references to the Oregon Revised Statutes (ORS) are to 2009.

[6] ORS 305.287 (2011) applies to all appeals to the Magistrate Division filed on or after September 29, 2011.  *See Village at Main Street Phase II, LLC v. Dept. of Rev.*, TC 5054, WL 3024117 at *6 (July 11, 2012); Or Laws 2011, ch 397.  The instant appeal was filed on or about March 12, 2012.

In the Tax Court, the burden of proof falls "upon the party seeking affirmative relief." ORS 305.427. That burden may be sustained by "a preponderance of the evidence," that is, by "the more convincing or greater weight of evidence." *Id*.; *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). Here, Plaintiff bears the burden to prove its requested RMV.

To sustain the burden of proof a party "must provide *competent* evidence of the RMV." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (citations omitted) (emphasis added). Such evidence includes "appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents and licensed brokers." *Metzger v. Clatsop County Assessor*, TC-MD No 120534D at 5 (Oct 30, 2012).

Ultimately, the real market value of a property is a question of fact and the court is responsible to determine that number. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted). This court has authority to determine the value of property "on the basis of the evidence before [it], without regard to the values pleaded by the parties." ORS 305.412.

B.  *Highest and best use*

The first step in the valuation process is to determine the highest and best use of the subject property. The parties agreed that the highest and best use of the subject property as improved is the existing use. The court accepts their assessment on the highest and best use question.

C.  *Valuation of the subject property*

The strongest evidence of the subject property's RMV is Plaintiff's purchase. Pliska testified that he began negotiations for the purchase of the subject property "around the first of

the year," which he clarified as 2011. Pliska further testified that the former owners of the subject property, two corporate entities owned and controlled by the McDougal brothers, had been trying to sell the resort building for years but could not find an interested buyer. Those individuals, whom both parties agree are sophisticated real estate developers and investors, approached Pliska on at least four separate occasions beginning as far back as 2002. Pliska initially had no interest in the subject property. After several early unsuccessful attempts to sell the property to Pliska, the prior owners again approached him sometime in mid to late 2010 offering to sell the property for $1.1 million. Pliska testified that he was initially not interested. According to the testimony, the sellers reported that they had a prospective buyer at that time who was willing to purchase the property for $1.1 million, but the deal fell through. Pliska ultimately agreed to purchase the subject property, plus the two adjoining unimproved commercial land accounts (approximately 3 acres each) for $1,052,187.50. Pliska paid $952,187.50 for the subject property; the remaining $100,000 was paid for the two adjoining three acre parcels which are not part of this appeal. The purchase was apparently part of a bulk purchase that included all of that property plus 14 undeveloped residential condominium lots, for $1,385,000. (Def's Rebuttal Ex B at 1; Pliska Trl Test.)

Pliska further testified that he has owned the adjoining golf course since 2002 and, on cross-examination, testified that he developed the nearby Comfort Inn & Suites hotel around 2008 or 2009 ("about 4 years ago"). (*See also* Def's Ex B at 3.) That property is located approximately 1/4 mile away from the subject property and golf course. Pliska testified on redirect that the subject property was more valuable to him because it was located adjacent to his golf course and allowed him to "expand his fence line," thereby increasing the size of his golf course. Acquisition of the subject property, which includes fairly sizable fitness area and dining

area with a commercial kitchen, plus additional office space, also enables Pliska to expand his golf course operation and offer a wider variety of services to the public (e.g, wedding and graduation ceremonies, a club membership that includes access to the fitness center).

Given the fact that Plaintiff purchased the subject property from sophisticated real estate investors/developers after protracted negotiations and years of unsuccessful attempts by the prior owners to sell the subject property, the court finds that the $952,000 purchase price is persuasive evidence of the market value of the subject property. The sale was completed in late March 2011, with the deed filed March 25, 2011, but the purchase price was effectively set in January 2011, on or about the date of assessment for the 2011-12 tax year. That fact eliminates the need to make any market adjustments for time.

The sale price of a recent, voluntary, arm's-length sale of property "between a buyer and seller, both of whom are knowledgeable and willing," although not "conclusive, is *very persuasive* of market value." *Kem v. Dept. of Rev*. (*Kem*), 267 Or 111, 114, 514, P2d 1335 (1973) (emphasis added). See also *Sabin v. Dept. of Rev*., 270 Or 422, 426-27, 528 P2d 69 (1974); and *Equity Land Res. v. Dept. of Rev*., 268 Or 410, 415, 521 P2d 324 (1974). The two important considerations are whether the sale was "recent" and whether it was "arm's-length." *Kem,* 267 Or at 114.

Defendant attempted to downplay or discredit the purchase by noting that the property had not been listed for sale with a real estate broker, but Defendant was unable to offer any possible reason why the prior owners, again, sophisticated real estate investors, would sell the property for approximately $950,000 if it was in fact worth $2,780,000, as Defendant contends. Pliska responded that the prior owners were well-known and active in the Eugene / Springfield area, with many connections in the real estate business (including real estate brokers and agents),

and had been trying to market the property informally for approximately 10 years. Pliska, himself an appraiser and seasoned real estate developer, and his two appraiser witnesses all testified persuasively that the subject property's remote location, its size and age, and the property's historically low occupancy rates, all negatively affected the attractiveness of the subject property to a prospective buyer. The court finds that those factors tend to strengthen the validity of the purchase price as a persuasive indicator of the market value of the subject property. Additionally, Plaintiff's appraiser Duncan testified that the purchase price of the subject property was a good indication of value, particularly given the subject property's history of high vacancy and expensive operating costs, and the large size of the building relative to its remote location. The court found Duncan to be a knowledgeable and credible witness. Plaintiff's other appraiser, Becraft, also testified that he had investigated the purchase of the subject property and concluded it was an arm's-length transaction indicative of market value.

Plaintiff also submitted a lengthy and detailed appraisal report relying on the sales comparison and income capitalization approaches. The value estimates under both approaches were remarkably close to the purchase price. Plaintiff's appraisers placed primary reliance on the sales comparison approach, which comports with the relevant discussion in a treatise published by the Appraisal Institute, which states in relevant part: "[t]ypically, the sales comparison approach provides the most credible indication of value for owner-occupied commercial and industrial properties, i.e., properties that are not purchased primarily for their income-producing characteristics." Appraisal Institute, *The Appraisal of Real Estate* 300 (13th ed. 2008). Accordingly, the sales comparison approach is a valid and reliable valuation tool in this case. Moreover, the appraiser's offered detailed explanations, both in their report and at trial, for the selection of their appraisal data, the adjustments they made, and the conclusions they

DECISION TC-MD 120224C                                                                      14

reached. Plaintiff's appraisers relied on the sale of seven properties they deemed comparable to the subject property because they had a similar mixture of gymnasium, kitchen/cafeteria, and office areas. The appraisers made qualitative adjustments to their comparable sales and concluded that the data indicated a value for the subject property of $18 per square foot, generating an estimated market value of $950,040. (Ptf's Ex 1 at 62.) Plaintiff's appraisers evaluated six leased properties to estimate market rents for the three distinct types of space within the subject property, determined what they believed to be appropriate adjustment for vacancy and credit loss and expenses, applied a cap rate based on two of those sales, and arrived at a value estimate of $899,643. (*Id*. at 72.) Defendant attempted to cast some doubt on the reliability of Plaintiff's appraisal during cross examination, but the points were relatively minor and generally adequately addressed by Plaintiff's appraisers. The court does find some of the data and conclusions perhaps somewhat questionable, but the same is true for Defendant's appraisal and, in the end, when considered in light of the purchase price, Plaintiff's evidence carries the day.

Pitted against Plaintiff's purchase price and lengthy and detailed appraisal report is Defendant's appraisal. Defendant's valuation excludes the sales comparison approach (except for reliance on that approach for the derivation of its cap rate), and utilizes the cost approach to value a very large building (55,280 square feet of gross building area, or GBA) built in 1979, more than 30 years before the January 1, 2011, assessment date. Plaintiff cited the Appraisal Institute's treatise on property valuation to challenge Defendant's reliance on the cost approach, arguing that the cost approach is best used for new or relatively new construction. Appraisal Institute, *The Appraisal of Real Estate* 382 (13th ed. 2008) ("Because cost and market value are usually more closely related when properties are new, the cost approach is important in

estimating the market value of new or relatively new construction."). The court agrees, and accordingly rejects Defendant's cost approach because of the age of the subject property and Defendant's lack of data to support depreciation, plus the fact that Defendant depreciated the building by 50 percent and still ended up with a value estimate roughly twice its estimate under the income approach ($5,800,000 under the cost approach and $2,780,000 under the income approach). That leaves Defendant with only its income approach.

Defendant's valuation of the income approach, as stated above, is $2,780,000. (Def's Ex A at 37-38.) It is difficult to reconcile that value estimate with the purchase price and other evidence submitted by Plaintiff. The court notes that Defendant's estimated market rents are considerably higher than Plaintiff's and, for the most part, exceed actual rents for the subject property. (*Id*. at 37; Ptf's Ex 1 at 67.) Additionally, Defendant uses a 10 percent vacancy and collection loss compared to Plaintiff's 20 percent figure, both of which are below the reported actual vacancy rate of 29 percent. (Ptf's Ex 1 at 69-70; Def's Ex A at 37.) Obviously, the higher that number (or percentage), the lower the value. The same is true for Defendant's expense rate, which its appraiser was unable to validate by resort to the market data, and which conflicts with the actual operation of the subject property and the conclusions of Plaintiff's appraisers who relied on market data. For those and other reasons which the court sees no reason to belabor, the court finds Plaintiff's evidence persuasive of market value and Defendant's evidence unpersuasive.

/ / /

/ / /

/ / /

/ / /

### III. CONCLUSION

The court has carefully evaluated the evidence and testimony in light of applicable law (including appraisal methodology therein) and concludes that the real market value of the subject property, assessor's Account 1847084, was $950,000 as of January 1, 2011. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted.

Dated this ___ day of January 2013.

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on January 31, 2013. The Court filed and entered this document on January 31, 2013.*